603 So.2d 824 (1991)
Elizabeth O'CAIN
v.
HARVEY FREEMAN AND SONS, INC. of Mississippi.
No. 07-CA-59446.
Supreme Court of Mississippi.
Decided December 18, 1991.
Rehearing Denied July 29, 1992.
*825 Jack C. Pickett, Margaret P. Ellis, Kitchens & Ellis, Pascagoula, for appellant.
James H. Heidelberg, Bryant Colingo Williams & Clark, Pascagoula, for appellee.
En Banc.
DAN M. LEE, Presiding Justice, for the Court:
This is a suit by a tenant against her landlord wherein the tenant, Elizabeth O'Cain, seeks damages for emotional distress stemming from the burglary of her apartment and the rape of her roommate. This appeal is from a grant of summary judgment in favor of the defendant-lessor, Harvey Freeman & Sons, by the Jackson County Circuit Court. This case contains very distinct procedural and substantive issues, both of equal importance in our treatment of the case. Therefore, for ease of organization, this opinion examines the substantive facts and law and the procedural issues of fact and law as four separate categories for review.
Finding cumulative error in the trial court's application of procedural and substantive law, we reverse the grant of summary judgment in favor of the defendant, Harvey Freeman & Sons, and remand the same to the trial court for further proceedings.

SUBSTANTIVE FACTS OF THE CASE
In October of 1981, the plaintiff, O'Cain, and her roommate, G.S.,[1] were sharing a two bedroom townhouse apartment in Pascagoula. The two bedrooms and a bathroom were located upstairs while the downstairs area consisted of the kitchen and living room. On the night of October 15, 1981, O'Cain was awakened by a foul, malodorous scent. Both bedroom doors were open, and she heard voices coming from her roommate's bedroom. O'Cain walked to the vicinity of the bathroom and peered into G.S.'s bedroom. By now she had ascertained that her roommate was being assaulted in some way. When she peered into her roommate's bedroom, she only got a glimpse of G.S.'s leg which was hanging off the side of the bed, but she could hear a male's voice. O'Cain panicked and entered the bathroom. She flushed the toilet and turned on the water hoping that if the intruder heard other noises in the apartment, he would leave. O'Cain then opened the bathroom door. When O'Cain opened the door, G.S. grabbed her and jerked her into the bedroom. As this happened, O'Cain stated that she only got a glimpse of the assailant's back as he was descending the stairs. Both women barricaded themselves in the bedroom, and they were able to awaken the residents next door by beating on the common wall. O'Cain and G.S. stated that the intruder came back up the stairs after they had locked themselves in the bedroom. He attempted to open the bedroom door but was unsuccessful since both women had secured the door. The next door neighbors called the police, and apparently the police arrived very quickly. G.S. and O'Cain got the officer's attention from the bedroom window.
There were only two ways to enter the apartment, the front door and a sliding glass patio door. The officer stated that the front door was secured, but there was a 15 to 18 inch opening at the sliding glass door. The officer entered through the opening in the glass door and found O'Cain and G.S. in an upstairs bedroom. The assailant, Larry Williams, was apprehended in a ditch about three quarters (3/4) of a mile from the apartment. Larry Williams was charged, tried, and convicted of the rape of G.S. He either served or is still serving time in the penitentiary for this crime.
O'Cain alleged that the lock on the sliding glass door to her apartment was insufficient. A sliding glass door typically contains a latch-type lock which locks when the latch is in the "up" position. O'Cain's sliding glass door locked when the latch was in the "down" position. Therefore, in order to enter O'Cain's apartment with the *826 door locked in the down position, one need only to slightly lift up on the door and slide the door on its tracks. By lifting the door, the latch would dislodge from the lock. The investigating officer readily ascertained that the rapist gained entry by lifting the glass door, dislodging the lock, and then sliding the door on its tracks.
O'Cain is certain that she locked both doors on the night in question. She was unaware, however, that the lock on the sliding glass door was inadequate protection. Hence, she had never complained about the lock to the landlord, Harvey Freeman & Sons. On the day following the rape, O'Cain contacted a locksmith who came out to the apartment and installed an additional lock on the patio door.
A substantial amount of discovery transpired between the parties. Several depositions were taken in the discovery phase of this case.
Billy Hancock, a locksmith who owned B & W Security in Pascagoula, stated that as a rule of thumb, patio doors are not very secure and can be easily compromised. Hancock stated that since the early 1970s, he had mentioned to at least two apartment managers at Chateau Tourraine that "Charlie bars" should be installed on the patio doors, but he did not remember if he actually told anyone associated with the apartments that security on the patio doors was inadequate. Hancock explained that a "Charlie bar" is a device which augments the security on a patio door. It is a self-storing bar which drops behind the movable door, and if there is no additional security on a patio door, Hancock always recommends "Charlie bars" or some other additional lock.
Upon O'Cain's request, Hancock inspected the patio door of the apartment in question. This inspection was several years after the fact of the break-in and rape. First of all, Hancock stated that it was the outside door in this unit which moved, an out-sliding door. This was not unusual at all as some patio doors are in-sliding, some out-sliding and some are double-sliding. Second, Hancock stated that the door was "installed normally." Hancock also stated that he believed that these apartments were built sometime between 1968 and 1973, and based on his examination of the doors, he was of the opinion that the doors had not been replaced since the original construction.
From a locked position, Hancock was able to violate the door using only his hands. He only had to lift slightly on the door, and the door rolled open in the tracks. "The difference between opening the door with it locked or unlocked is less than five seconds." Hancock explained the weak security on the patio door:
I don't know what the manufacturer had in mind or what his intent was, but the reason you were able to open this door is because the door could be lifted three-eighths of an inch, and when you lifted it from that position you didn't lift the entire door. You lifted one edge which is called the tilt, and because the hook was shaped like this [indicating] and it wasn't fully down because the strike was holding it up.
At the time of Hancock's inspection there were new occupants of the apartment. The additional lock O'Cain had installed on the patio door was still there. Finally, Hancock stated that the ease in which the door could be opened might have existed since the time that the doors were installed.
The responding officer, Wayne McCarty, gave deposition testimony. He stated that the area where the rape occurred was a low crime area. McCarty testified that he entered the apartment through the patio door which was open about 15 to 18 inches. The front door was secured when the officer arrived on the scene. Five to six weeks prior to the deposition, McCarty visited the apartment and stated that he was able to open the locked door by simply giving the outside door a slight lift before sliding.
O'Cain alleged mental and emotional distress injury stemming from the burglary of her apartment and the rape of her roommate. As support for her injury, O'Cain relied upon the deposition testimony of her former counselor, Ms. Polly Bridges.
*827 Polly Bridges has a master's degree in psychology from the University of South Alabama. On March 9, 1983, O'Cain saw Bridges for the first time. Bridges counseled with O'Cain 24-25 times over a three year period. O'Cain, who worked with her mother and step-father in the restaurant business on the Gulf Coast, was having trouble getting along with her mother and step father. At her mother's suggestion, she sought counselling in an effort to improve her relationship with her parents. O'Cain's mother participated in some of the counselling sessions. Prior to the rape incident in October of 1981, O'Cain had divorced, and her divorce was still weighing on her mind.
In February of 1985, Bridges noticed O'Cain's problem with weight control and began tracking her weight at the bi-monthly counselling sessions. O'Cain's weight was more than desired. But at some point in 1981, and it is not known when, O'Cain lost 68 pounds on an Optifast diet. "In 1981 weight was 225 pounds. On Optifast diet dropped 68 pounds and kept it off until November-December of 1981 (after rape). Since then I have lost and gained, lost and gained, but I've never gotten past 195 until the last 3 to 4 months." O'Cain described periods of depression which would be followed by eating binges. According to Bridges, O'Cain suffers from a compulsive eating disorder which is stress induced.
As part of the counselling therapy, Bridges asked O'Cain to prepare a summary of major events in her life. On the summary O'Cain stated that her weight problem began when she was in third grade. O'Cain was born in 1955, and would now be 35-36 years old. Bridges stated that stresses in O'Cain's life which could be contributing to her weight problem included the strained relationships with her mother and step father, the divorce of her parents at an early age, O'Cain's own divorce, unsuccessful relationships with men, and chronic financial problems. "Anything that is stressful will do damage to a person who has a compulsive eating disorder." O'Cain was to continue her bi-monthly sessions with Bridges, but she stopped coming. The last counselling session with O'Cain occurred in April of 1986. Bridges saw both O'Cain and her mother at this last session, and the primary problem which was discussed at this last session was O'Cain's financial problems. In August of 1987, O'Cain stopped in to see Bridges to ask her to prepare a report for her lawyers in this suit.
Bridges did not remember when the rape incident was first raised in counselling, although it was discussed. Bridges stated that O'Cain uses weight as a protective measure against rape. In essence, she remains above her ideal weight as a protective measure against rape. Thus, O'Cain thinks that if she maintains extra weight, she is protecting herself against future attacks.

PROCEDURAL FACTS OF THE CASE
Elizabeth O'Cain originally filed suit on March 2, 1987, in the Jackson County Circuit Court. In the original suit, O'Cain alleged that:
[O]n or about October 15, 1981, while the Plaintiff was in the apartment, her roommate, [name omitted] was held at knifepoint and raped. As a direct and proximate result of this act of violence, the Plaintiff suffered extensive mental and emotional injuries of a permanent and enduring nature.
... [A]s a direct and proximate result of the negligence of the corporate Defendant, the Plaintiff suffered extensive mental, phychological (sic) and emotional injuries of a permanent and enduring nature.
On January 27, 1988, after several months of discovery, Harvey Freeman filed a motion for summary judgment. A hearing on the motion was held on February 5, 1988. Four days later, on February 9, 1988, the trial judge issued a brief order which treated the motion for summary judgment as a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to M.R.C.P. 12(b)(6). The complaint was dismissed with all costs charged to O'Cain.
*828 On February 19, 1988, O'Cain filed an amended complaint. Harvey Freeman & Sons filed a "Motion to Dismiss or in the Alternative Motion for Summary Judgment of Harvey Freeman & Sons, Inc. of Mississippi" on March 15, 1988. A hearing on this motion was held two weeks later on March 31, 1988. Following the hearing, the trial judge issued a Memorandum Opinion and Order on June 7, 1988. This opinion and order granted summary judgment in favor of Harvey Freeman & Sons, and now O'Cain appeals to this Court from this adverse ruling by the trial court.
The record indicates that the trial judge dismissed the first suit for failure to state a claim upon which relief can be granted in that the cause of action attempted to state a claim for bystander recovery for emotional distress. The trial court concluded that in this state, O'Cain had no cause of action as a matter of law for bystander recovery. Therefore, dismissal of the first suit without prejudice afforded O'Cain an opportunity to amend and refile her complaint. The amended complaint attempted to allege emotional injury stemming from the invasion of O'Cain's apartment and the rape of her roommate rather than a bystander claim based on the contemporaneous witnessing of a traumatic event.
Plaintiff's apartment was burglarized and her roommate was raped by one, LARRY WILLIAMS, who entered her apartment through a sliding glass door. That as a result of said burglary and rape, Plaintiff was severely injured and suffered extensive mental psychological and emotional injuries or (sic) a permanent and enduring nature.
Amended Complaint, Record at 485.

Standard of Review
We review de novo a lower court's grant of a summary judgment motion. Short v. Columbus Rubber & Gasket Co., Inc., 535 So.2d 61, 63 (1988). Thus, we use the same standard that was used by the trial court. 10 Wright, Miller & Kane, Federal Practice and Procedure § 2716 (1983 and Supp. 1988). We must review all evidentiary matters before us in the record: affidavits, depositions, admissions, interrogatories, etc. The evidence must be viewed in the light most favorable to O'Cain, the nonmoving party, and she is to be given the benefit of every reasonable doubt. Smith v. Sanders, 485 So.2d 1051, 1054 (Miss. 1986); Dennis v. Searle, 457 So.2d 941, 944 (Miss. 1984). The burden of demonstrating that no genuine issue of fact exists is on Harvey Freeman & Sons. Short v. Columbus Rubber and Gasket Co., 535 So.2d 61, 63-64 (Miss. 1988). A motion for summary judgment lies only when there is no genuine issue of material fact, and the moving party is entitled to a judgment as a matter of law. M.R.C.P. 56(c). The court does not try issues on a rule 56 motion, it only determines whether there are issues to be tried. In reaching this determination, the court examines affidavits and other evidence to determine whether a triable issue exists, rather than the purpose of resolving that issue. Comment, M.R.C.P. 56.

PROCEDURAL CONSIDERATIONS
First of all, the trial court found that the amended complaint restated the same grounds as contained in the original complaint. Presumably, the original complaint was dismissed in that it stated a claim for bystander recovery.
The second summary judgment motion which the defendant filed was styled, "Motion to Dismiss or in the Alternative Motion for Summary Judgment of Harvey Freeman & Sons, Inc. of Mississippi." The motion was brought pursuant to M.R.C.P. 12(b)(6) and M.R.C.P. 56, as was clearly indicated in the body of the motion itself. O'Cain was represented at the hearing on this motion, but she did not file any additional depositions, affidavits, interrogatories, etc. since the hearing on the first summary judgment motion. The trial court opinion noted that O'Cain did not respond to the motion prior to the hearing, despite the fact that a response was "required" by the rules.
A response from O'Cain is not mandated by Rule 56(c) of the Mississippi Rules of Civil Procedure as suggested by the trial *829 court opinion. "The motion shall be served at least ten days before the time fixed for the hearing. The adverse party prior to the day of the hearing may serve opposing affidavits." M.R.C.P. 56(c) (emphasis added). While it is true that if a nonmovant elects to make no response prior to the hearing on summary judgment, then one's non-action is at his own peril.[2] However, M.R.C.P. 56(c) imposes no affirmative requirement on the nonmoving party to respond before the hearing on the motion. Rule 56(c) by its own terms leaves that option with the nonmoving party.
Furthermore, O'Cain did respond to the summary judgment motion. The depositions and interrogatories filed by O'Cain prior to the first summary judgment hearing remained on file following the entry of O'Cain's amended complaint. The defenses raised by O'Cain prior to the first summary judgment hearing on February 5, 1988, were likewise applicable to the second summary judgment motion as well. Therefore, O'Cain merely elected to make no additional response after filing her amended complaint.
Second, the trial court's opinion discusses the statute of limitations and its application to this case. Suffice it to say that the statute of limitations has no application in this case. According to the trial court, the amended complaint either re-states the original complaint which had already been dismissed, or it states new claims and new parties which are barred by the six-year statute. See Miss. Code Ann. § 15-1-49 (1972) (Amended 1989). The date of the event was October 15, 1981. The complaint was filed on March 2, 1987, seven months prior to the expiration of the six-year period. The action was dismissed by way of 12(b)(6) on February 9, 1988. The amended complaint was filed on February 19, 1988, six years and seven months after the date of the occurrence.
M.R.C.P. 15(a) states that:
On sustaining a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6), or for judgment on the pleadings, pursuant to Rule 12(c), thirty days leave to amend shall be granted, provided matters outside the pleadings are not presented at the hearing on the motion.
Within ten days after the 12(b)(6) motion was sustained, O'Cain filed an amended complaint which attempted to frame the claim as something other than one for bystander recovery. Under M.R.C.P. 15(a), O'Cain was not required to petition the court for 30 days leave as the appellee suggests. "[T]hirty days leave to amend shall be granted. ..." M.R.C.P. 15(a) (emphasis added). Further, M.R.C.P. 15(c) applies. "Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading." M.R.C.P. 15(c).

SUBSTANTIVE ISSUES OF THE CASE
Bystander Recovery: The trial judge found that this was a case of bystander recovery, and as a matter of law in this state, O'Cain could not recover. The trial judge is correct in his conclusion that O'Cain could not recover under the prevailing standard of liability for bystander recovery. However, the trial judge is incorrect in his conclusion that this is a bystander case.
In Entex, Inc. v. McGuire, Mr. McGuire witnessed an explosion in which his wife was engulfed in flames. Entex, Inc. v. McGuire, 414 So.2d 437, 439 (Miss. 1982). This Court set out the criteria which one must meet on a claim of emotional trauma by a bystander: (1) Whether the plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it; (2) Whether the shock resulted from a direct emotional impact upon *830 plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after the occurrence; (3) Whether the plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship. Entex, 414 So.2d at 444. See Thomas v. Global Boat Builders & Repairmen, 482 So.2d 1112, 1117 (Miss. 1986).
In the case at bar, O'Cain fails the Entex test on item two. O'Cain did not actually witness the rape itself, although she was aware that her roommate was being assaulted in the adjacent room.
O'Cain recognizes that her claim fails as one for a bystander and argues that she is not presenting a bystander claim. Rather, she alleges that as a result of the invasion of her apartment and rape, she has suffered extensive mental, psychological and emotional injuries. She makes no claim based on the actual witnessing of the event. In essence, her emotional problems stem from the fact that her apartment and roommate were violated. Extending to O'Cain the benefit of a reasonable doubt, we can proceed on the notion that her claim is for something other than bystander recovery.
Intervening, Superseding Criminal Act: The trial judge also found that the criminal act of Larry Williams was a superseding criminal act which cut off liability from the alleged original wrongdoer, Harvey Freeman & Sons. The trial court opinion stated that criminal acts are, by definition, superseding causes. Unfortunately, this approach by the trial court is a little too simple. As a general rule of thumb, criminal acts can be intervening causes which break the causal connection with the defendant's negligent act, if the criminal act is not within the realm of reasonable foreseeability. Touche Ross v. Commercial Union Ins., 514 So.2d 315, 324 (Miss. 1987); Robinson v. Howard Brothers of Jackson, Miss., 372 So.2d 1074, 1076 (Miss. 1979). In applying reasonable foreseeability to the facts at bar, O'Cain argues that criminal activity is always within the realm of reasonable foreseeability for a lessor of apartment residential property.
Whether something is or is not within the realm of reasonable foreseeability depends upon the facts of the case and the duty which the plaintiff asserts for the particular defendant. "[A]n independent intervening cause is one that could not have been reasonably foreseen by the defendant while exercising due care." Kelly v. Retzer & Retzer, Inc., 417 So.2d 556, 562 (Miss. 1982); Oliver Bus Lines v. Skaggs, 174 Miss. 201, 210, 164 So. 9, 12 (1935). In the case at bar, the question of reasonable foreseeability of criminal activity would be for the trier of fact. Furthermore, the question of superseding intervening cause is so inextricably tied to causation, it is difficult to imagine a circumstance where such issue would not be one for the trier of fact. See Gibson v. Avis Rent-A-Car System, Inc., 386 So.2d 520, 522 (Miss. 1980) (whether intervening cause is foreseeable is for trier of fact). In summary, blanket application of the general rule that intervening criminal acts extinguish the defendant's liability is inappropriate for this case.
Finally, in the case at bar, O'Cain stated that she had no idea that the lock on her patio door was insufficient. Therefore, it goes without saying that O'Cain had never notified the landlord about the questionable lock on the patio door. The door would lock, but as it turned out, the lock was poorly secured. This condition should be treated as a latent defect in the premises. There are "special" rules which pertain to latent defects. A landlord is liable for latent defects which he knows about and conceals or being aware of the defect, he fails to inform the tenant. Loflin v. Thornton, 394 So.2d 905, 906 (Miss. 1981). On this point, the locksmith's testimony is particularly significant. Although he could not remember whom he informed or when, the locksmith stated that he had informed at least two managers at the Chateau Tourraine that "Charlie bars" were needed to augment the existing security. Ergo, we find a dispute of a material fact regarding *831 the landlord's notice or not of a latent defect on the premises. Admittedly, the locksmith's testimony on the question of the landlord's notice is somewhat confusing. Therefore, based on the record that we have at this time, summary judgment was premature without further development on this issue.
This is a straight negligence action, and O'Cain must prove the traditional elements of her claim. Duty-Breach-Causation-Damages. As usual, we intimate no opinion whatsoever on the merits of the plaintiff's claim or her ability to meet the requisites of a negligence action. We merely find error in the procedural and substantive grounds upon which the trial court relied in granting judgment along with an undeveloped issue pertaining to the landlord's notice or not of a latent defect.
Accordingly, we reverse the order of summary judgment entered in this case by the Jackson County Circuit Court on June 7, 1988, and remand the same for further proceedings.
REVERSED AND REMANDED.
PRATHER, ROBERTSON, SULLIVAN, and BANKS, JJ., concur.
SULLIVAN, J., concurs by separate written opinion, joined by ROY NOBLE LEE, C.J., PRATHER, ROBERTSON, and BANKS, JJ.
PITTMAN, J., dissents by separate written opinion, joined by HAWKINS, P.J.
McRAE, J., not participating.
SULLIVAN, Justice, concurring:
I concur with the result of the majority but write separately because I believe the opinion does not discuss a question of law at the foundation of the suit.
Landlord-tenant relationships are one of the last vestiges in this state to which the common law doctrine of caveat emptor applies.[1]See, e.g., Keyes v. Guy Bailey Homes, Inc., 439 So.2d 670, 673 (Miss. 1983) (with regard to homebuilders, doctrine of caveat emptor and merger no longer stand in this jurisdiction). The doctrine developed in sixteenth-century England, when the lease, which usually transferred land for agricultural purposes, was considered a conveyance of real property. Javins v. First Nat'l Realty Corp., 428 F.2d 1071, 1077 (D.C. Cir.1970), cert. denied, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970); Landlord's Liability for Defective Premises: Caveat Lessee, Negligence, or Strict Liability, 1975 Wis.L.Rev. 19, 26 (1975). With the advent of the Industrial Revolution, more and more people abandoned the rural, agrarian life to become city dwellers. Landlord's Liability for Defective Premises, 1975 Wis.L.Rev. at 26. This shift to urban areas also caused changes in the lease agreement. No longer did the lease merely convey real property; rather it took on the appearance of a contract for a place to live. Id.
With this shift away from agrarian life, the doctrine of caveat emptor created problems for the residential tenant. Previously, structures on property were relatively simple in design and the agrarian leaseholder had the expertise to discover and repair any defects on the property. Id. at 28. Urban leaseholders, however, did not have the expertise, nor the funds, to repair the increasingly complex structures they occupied. Id.
Through precedent, the doctrine made its way into the American courts. American courts, recognizing the harshness of the doctrine, have carved out various exceptions. See generally, Restatement (Second) Property (Landlord & Tenant) §§ 17.1-17.6 (known latent defects, lease for purpose involving admission of public, landlord retains control of parts of property, landlord contracts to repair, legal duty to repair dangerous condition, negligent repair); 52 C.J.S. Landlord & Tenant § 417.
More progressive courts, recognizing the unsuitability of the doctrine to modern landlord-tenant relationships, have abrogated *832 the doctrine of caveat emptor in favor of an implied warranty of habitability. Detling v. Edelbrock, 671 S.W.2d 265, 268-69 & n. 4 (Mo. 1984) (citing seventeen jurisdictions recognizing an implied warranty of habitability); see also, Uniform Residential Landlord and Tenant Act § 2.104. Factors in the rationale behind recognition of the implied warranty include: (1) "[r]ecognition of the contractual nature of modern lease agreements and the trend against caveat emptor in favor of a warranty of fitness in consumer transactions; (2) the widespread enactment of state and local housing regulations establishing minimum community standards of habitability; (3) the tenant's reasonable expectation that the property leased for the purpose of human habitation for a designated period of time will be fit for that use for the duration of the lease; and (4) the belief that tenants lack the means or abilities either to fully inspect modern dwelling units or to maintain the premises during the term of the lease." Detling, 671 S.W.2d at 269 [citing King v. Moorehead, 495 S.W.2d 65, 69-75 (Mo. App. 1973); Green v. Superior Court, 10 Cal.3d 616, 111 Cal. Rptr. 704, 707-12, 517 P.2d 1168, 1171-76 (1974); Javins v. First Nat'l Realty Corp., 428 F.2d 1071, 1074-80 (D.C. Cir.), cert. denied, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970)].
Our Court has unquestioningly applied caveat emptor to landlord-tenant relationships. See, e.g., Wilson v. Allday, 487 So.2d 793 (Miss. 1986); Loflin v. Thornton, 394 So.2d 905 (Miss. 1981). Recognizing that tenants should not be without a remedy, we have created exceptions to the doctrine.[2] The majority today continues to apply the doctrine without questioning the unsuitability of the doctrine with regard to contemporary residential leases.
I can no longer endorse the application of caveat emptor to residential lease agreements.[3] With regard to such leases, we should dispose of the outmoded, problematic and unduly burdensome doctrine of caveat emptor which treats the lease as a conveyance of land. The better view is to recognize that landlords are not selling an interest in land, residential tenants do not intend to purchase an interest in land, residential leases are contracts, and landlords have more incentive and opportunity than tenants to inspect and maintain the condition of the premises. See Becker v. IRM Corp., 38 Cal.3d 454, 213 Cal. Rptr. 213, 217, 698 P.2d 116, 120 (1985); Javins v. First Nat'l Realty Corp., 428 F.2d 1071, 1074 & 1079 (D.C. Cir.1970).
Recognizing that non-commercial residential leases are no longer controlled by property law would eliminate the rationale behind the persistent refusal of this Court to apply an implied warranty of habitability or fitness to residential leases. Such a holding would be in line with the recent legislative enactment of the Residential Landlord and Tenant Act (RLTA), H.B. No. 293, Regular Sess. 1991 (effective July 1, 1991), which requires a landlord to "comply with the requirements of applicable building and housing codes materially affecting health and safety" and to "[m]aintain the dwelling unit, its plumbing, heating and/or cooling system, in substantially the same condition as at the inception of the lease... ." RLTA, H.B. No. 293, section 12(a) & (b) (Emphasis added). Although the legislature did not expressly impose a duty upon landlords to provide and maintain fit and habitable premises, by allowing tenants the right to repair defects and receive reimbursement of the expenses of such repairs which violate the obligations of the landlord, see RLTA, H.B. No. 293, section 8, the Legislature has implicitly recognized an implied warranty of habitability with the standard being the building and housing codes. Cf. Landlord's Liability for Defective Premises: Caveat Lessee, *833 Negligence, or Strict Liability, 1975 Wisc. L.Rev. 19, 114 (1975).
Recognizing that building and housing codes which affect health and safety generally are often governed locally, I advocate that the bare minimum standard for an implied warranty of habitability should require a landlord to provide reasonably safe premises at the inception of a lease, and to exercise reasonable care to repair dangerous defective conditions upon notice of their existence by the tenant, unless expressly waived by the tenant. See, e.g., Fitzgerald v. Cestari, 569 So.2d 1258, 1260 (Fla. 1990) [citing Mansur v. Eubanks, 401 So.2d 1328, 1329-30 (Fla. 1981)]; Hand v. Davis, 1990 WL 96583 at 2 (Del.Super. 1990) [citing Ford v. Ja-Sin, 420 A.2d 184, 186 (Del.Super. 1980)]; Becker v. IRM Corp., 38 Cal.3d 454, 213 Cal. Rptr. 213, 221-22, 698 P.2d 116, 125 (1985); Einhorn v. Seely, 136 A.D.2d 122, 525 N.Y.S.2d 212, 215 (N.Y.A.D.Dept. 1 1988) (cites therein); see also Favreau v. Miller, 591 A.2d 68 (Vt. 1991) (statutory implied warranty of habitability includes safe, clean and fit premises).
Breach of the duty to use reasonable care to provide safe premises would entitle the tenant to pursue contract remedies as well as tort. Imposition of tort liability is not unjust. When a product is sold which causes personal injuries, an action in tort may be maintained against the manufacturer or distributor. Hall v. Mississippi Chemical Exp., Inc., 528 So.2d 796, 799 (Miss. 1988) (manufacturer); Coca Cola Bottling Co., Inc. v. Reeves, 486 So.2d 374, 378 (Miss. 1986) (distributor). Likewise when a building is constructed which causes injuries or damages, an action in tort may be maintained against the builder. Keyes v. Guy Bailey Homes, Inc., 439 So.2d 670, 673 (Miss. 1983). There is no reason why a landlord should not also be subject to tort liability when he has failed to use reasonable care to provide safe premises and this failure has caused the tenant personal injuries.
This is not to say that a landlord is an insurer of safety. A landlord is not. Making a landlord subject to tort liability merely requires him to act as a reasonable landlord under the circumstances of the case. The tenant would still be required to show duty, breach, causation, and damages, and the landlord would be entitled to raise the standard tort defenses, such as contributory negligence, unforeseeability or intervening cause.
Applied to the instant case, I would find that Freeman & Sons owed a duty to O'Cain to use reasonable care to provide safe premises at the inception of the lease.
ROY NOBLE LEE, C.J., PRATHER, ROBERTSON and BANKS, JJ., join this opinion.
PITTMAN, Justice, dissenting:
This Court has decided to reverse a summary judgment granted against a tenant in a suit wherein the tenant, Elizabeth O'Cain, makes a claim against her landlord based on her emotional distress resulting from the burglary of her apartment and the rape of her roommate. Because I would affirm the grant of a summary judgment, I respectfully dissent.

I.
While I agree with Justice Dan M. Lee and the majority that O'Cain could not recover under the prevailing standard of liability for bystander recovery and that the trial court's approach classifying the criminal act of Williams as a superseding criminal act cutting off liability is too simple, I do not agree with my esteemed colleagues' basis for reversal. This Court is reversing the case at bar based on the testimony of the locksmith. Justice Dan M. Lee admits that the testimony of the locksmith is confusing. The locksmith's advice to at least two managers at the Chateau Tourraine that "Charlie bars" were needed to augment the existing security was standard advice to any owner of sliding glass doors, notwithstanding the type of lock on the door. It is simply a standard sales pitch. This testimony does not create a dispute of material fact. None of the parties dispute evidence presented through the locksmith. It was a matter ripe for the application of Mississippi law. Summary judgment was appropriate in the case at bar.

*834 II.
Although summary judgment was not appropriate for many of the reasons contained in the trial court opinion such as bystander recovery and superseding criminal activity, I would find that summary judgment is appropriate in this case for other reasons not considered by the trial court. In affirming a grant of summary judgment, this Court can rely on other grounds which were not even considered by the trial court. See Brocato v. Mississippi Publishers Corp., 503 So.2d 241, 244 (Miss. 1987). This is a negligence action, and O'Cain must prove the four traditional elements of a negligence suit, Duty-Breach-Causation-Damages. I examine the first element, duty.
Does the landlord, Harvey Freeman & Sons, have a duty to the tenant, O'Cain? In the absence of an express agreement, there is no duty or obligation upon a landlord to make repairs. Loflin v. Thornton, 394 So.2d 905, 906 (Miss. 1981). Only where there is an agreement for specific repairs will a breach of that agreement impose liability for personal injury. Loflin, 394 So.2d at 906 (citing Floyd v. Lusk, 190 So.2d 451 (Miss. 1966); Weldon v. Lehmann, 226 Miss. 600, 84 So.2d 796 (1956); Ford v. Pythian Bondholders Protective Comm., 223 Miss. 630, 78 So.2d 743 (1955); Hodges v. Hilton, 173 Miss. 343, 161 So. 686 (1935)).
A landlord/lessor has no obligation to make repairs to leased premises at all, even if they are necessary, in the absence of a contract to do so. Ford v. Pythian Bondholders, 223 Miss. 630, 78 So.2d 743 (1955). Where the lessor reserves control over a designated area for common use of tenants and is negligent, lessor is liable for resulting injury. However, the lessor must have actual or constructive knowledge of the defect and a sufficient opportunity to repair the same. Turnipseed v. McGee, 236 Miss. 159, 109 So.2d 551 (1959).
Wilson v. Allday, 487 So.2d 793, 796 (Miss. 1986).
Did the landlord contract with O'Cain to make repairs to her apartment? NO. The lessor reserved a right to inspect in item nine of the lease, but the lease contains no covenant which would include repair work on a patio door lock. The only covenant to repair which is contained in the lease applied to "any accident to or defect in the water pipes, gas pipes, electric light wires or fixtures or heating apparatus... ."
A better question to consider would be, "How could one repair that which is not broken?" The lock on the patio door worked. The problem is that it did not work very well. The real duty which O'Cain is seeking to impose on the landlord would appear to be one of a periodic security inspection of all doors and locks in each apartment unit. Such a duty did not exist in contract between the parties, nor does one exist in law.
In the facts sub judice, it is quite significant that O'Cain stated that she had no idea that the lock on her patio door was insufficient. As Justice Dan M. Lee noted, it goes without saying that the landlord had never been notified about the questionable lock on O'Cain's patio door, the door that would lock but was poorly secured. Thus, the landlord had no notice. I agree that this condition should be treated as a latent defect in the premises and that the "special" rules which pertain to latent defects are applicable. (i.e. A landlord is liable for latent defects which he knows about and conceals or being aware of the defect, he fails to inform the tenant. Loflin v. Thornton, 394 So.2d 905, 906 (Miss. 1981)). Before the landlord can be charged with liability for the latent defect, he must be aware (i.e., have notice), of the problem. The undisputed facts of this record reveal that the landlord had no knowledge of the insufficient lock on O'Cain's patio door. This is not to be confused with the statement by the locksmith who stated that in the 1970s, he recommended that "Charlie bars" be installed on all patio doors since such doors are easily compromised. This is the standard recommendation which the locksmith makes to everyone who has a sliding glass door which is not augmented by additional security.
*835 To summarize, there is no duty to repair absent some covenant to repair. For latent defects, no duty matures on the part of the landlord until he has notice of the problem. While there is a duty to use reasonable care to keep common areas reasonably safe, Cappaert v. Junker, 413 So.2d 378, 379 (Miss. 1982), the facts at bar present no situation which would avail the common area exception. No common area which the landlord controls is involved in this case.

III.
There is no genuine issue of a material fact in this case. The disputes are purely legal ones. As a matter of law, summary judgment was proper, but not for the reasons contained in the trial court opinion. This is a straight negligence action, and O'Cain must prove the traditional elements of her claim: Duty-Breach-Causation-Damages. O'Cain can not get past the first element, duty.
Accordingly, I would affirm the order of summary judgment entered in this case by the Jackson County Circuit Court.
HAWKINS, P.J., joins this dissent.
NOTES
[1] The initials "G.S." are used to protect the identity of the rape victim.
[2] When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him. M.R.C.P. 56(e). (emphasis added).
[1] When applied to the landlord-tenant relationship this doctrine means the tenant takes the premises as he finds them with no implied warranty of fitness. Cappaert v. Junker, 413 So.2d 378, 279-80 (Miss. 1982).
[2] We have recognized exceptions to the doctrine for (1) failure to disclose known latent defects, (2) defects in premises subject to common use, (3) negligent repairs, and (4) express covenants to repair. Wilson v. Allday, 487 So.2d 793, 796 (Miss. 1986); Loflin v. Thornton, 394 So.2d 905, 906 (Miss. 1981); Turnipseed v. McGee, 236 Miss. 159, 166, 109 So.2d 551, 554 (1959).
[3] The doctrine continues to have applicability to agricultural and commercial leases which intend to convey an interest in land.