# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-CA-00669-SCT

*MELISSA ENTRICAN*

*v.*

*DOUG MING, JEREMY CAMPBELL AND HMA CORPORATION, INC. d/b/a RANKIN MEDICAL CENTER AMBULANCE SERVICES a/k/a REMS*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/09/2006 |
| TRIAL JUDGE: | HON. W. SWAN YERGER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | ALAN D. LANCASTER |
| ATTORNEY FOR APPELLEES: | KIMBERLY NELSON HOWLAND |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | REVERSED AND REMANDED - 08/02/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE SMITH, C.J., DICKINSON AND LAMAR, JJ.**

**SMITH, CHIEF JUSTICE, FOR THE COURT:**

¶1.     On January 26, 2000, Melissa Entrican filed suit against Doug Ming, Jeremy Campbell, and REMS (sometimes referred to hereinafter as "Ambulance Service Defendants"), along with Frank B. Briggs, M.D., Martha D. Dickens, M.D., Beverly McMillan, M.D., Karl Hatten, M.D., and River Oaks Hospital, alleging that the negligence of these parties caused or contributed to the death of her minor daughter, Alisha Peavy. By stipulation of the parties, River Oaks Hospital and its employee physicians, Dr. Dickens, Dr. McMillan, and Dr. Hatten, were dismissed from the suit with prejudice. After this dismissal, only Entrican's claims against the Ambulance Service Defendants and Dr. Briggs remained.

¶2. The trial began on January 17, 2006, and at the close of Entrican's case-in-chief, counsel for the Ambulance Service Defendants moved for a directed verdict on the basis that the negligence of River Oaks Hospital, by and through its emergency department physician, Dr. Dickens, superceded any alleged negligence of the Ambulance Service and rendered any alleged negligence of the Ambulance Service Defendants only a remote and non-actionable cause of Alisha's death.

¶3. On February 9, 2006, Judge Yerger granted the Ambulance Service Defendants' motion for a directed verdict, holding that the negligent omissions of Dr. Dickens in failing to recognize that Alisha was in hypovelemic shock, in failing to adequately resuscitate Alisha by giving blood and intravenous fluids, and/or in failing to transfer Alisha to another medical facility, were not foreseeable by the Ambulance Service Defendants when they decided to transport Alisha to River Oaks, the nearest hospital. He further concluded that the negligence of Dr. Dickens and/or other River Oaks employees was an intervening and superceding cause of Alisha's death, and therefore any negligence on the part of the Ambulance Service Defendants was only a remote and non-actionable cause. Judge Yerger then dismissed the Ambulance Service Defendants with prejudice. Entrican filed a motion for a new trial, which Judge Yerger denied on March 22, 2006, and she now appeals to this Court for review. On appeal, Entrican asserts the following errors:

I. **The Trial Court Committed a Prejudicial Legal Error by Improperly Granting the Motion for Directed Verdict of the Defendant on the Ground That the Negligence of the River Oaks Hospital and its Emergency Room Physician Constituted a Superceding Intervening Cause of the Death of Alisha Peavy.**

2

II.     **The Trial Court Committed a Prejudicial Legal Error in Granting the Motion for Directed Verdict of Defendants on the Ground That the Negligence of the Defendants Constituted Only a Remote Cause of the Death of Alisha Peavy.**

III.    **The Trial Court Committed a Prejudicial Legal Error in Granting the Motion for Directed Verdict of Defendants on the Ground That the Negligence of the River Oaks Hospital and its Emergency Room Physician and the Negligence of Dr. Briggs Were Not Foreseeable by the Defendants.**

IV.     **The Trial Court Committed a Prejudicial Legal Error in Granting the Motion for Directed Verdict of Defendants in That in Rendering its Decision, the Trial Court Failed to View the Evidence in a Light Most Favorable to the Plaintiff Together With All Reasonable Inferences That Could Be Drawn Therefrom.**

¶4.     However, these issues have been combined and restated by the Court, and therefore we will address only the following issue:

I.      **Whether the Ambulance Service Defendants Knew or Should Have Known That River Oaks Hospital Was Not Capable of Managing Alisha's Condition, and Whether Their Actions in Transporting Alisha to That Hospital Were Only a Remote Cause of Her Death.**

**FACTS**

¶5.     Appellant Melissa Entrican is an adult resident citizen of Rankin County, Mississippi, and is the mother of Alisha Peavy, the deceased. Appellees Doug Ming and Jeremy Campbell are adult resident citizens of the State of Mississippi and emergency medical technicians employed by Appellee Rankin Medical Center Ambulance Services (hereinafter "REMS"). At all relevant times, REMS was acting by and through its emergency medical

3

technicians, Ming and Campbell, who were acting within the scope of their employment with REMS.

¶6. On January 26, 1998, at approximately 11:30 a.m., Alisha was involved in a motor vehicle collision which occurred at the intersection of Highway 471 and Bay Pointe Road within Rankin County, Mississippi. In response to a call at REMS for emergency assistance at the scene of the collision, Ming and Campbell arrived at the scene in a REMS ambulance. Upon arrival, Ming and Campbell noted massive damage to Alisha's side of the automobile and found Alisha trapped in the passenger seat. They also noted that she was approximately eight (8) months pregnant and had a soft abdomen with bruising. With episodes of decreased responsiveness, a systolic blood pressure in the 80 to 90 range, and signs of internal bleeding, Alisha was classified by Ming and Campbell as a Code 2 case (indicating that she was deteriorating) and taken to the River Oaks Hospital.

¶7. At approximately 12: 40 p.m., Alisha was admitted to the emergency department at River Oaks. After this time, Ming and Campbell no longer took care of Alisha but remained at River Oaks Hospital in case the physicians determined that transport to another hospital was needed after initial stabilization. Martha Dickens, M.D., the physician in River Oaks Hospital's emergency department, accepted Alisha as a patient. Dr. Dickens, employed nine years as a full-time emergency physician, testified at trial that she was trained in Advanced Trauma Life Support, which is a system of generally accepted protocols for the treatment of trauma patients. As an ATLS-certified physician, Dickens was trained to recognize the signs and symptoms of hypovolemic shock. Dr. Dickens also testified that when someone is in

4

hypovolemic shock, the correct procedure is to administer fluids to the patient, and then if vital signs continue to deteriorate, to administer blood. Dr. Dickens also testified that she feared Alisha was in hypovolemic shock and proceeded to administer fluids in an attempt to improve Alisha's vital signs. However, the vital signs continued to deteriorate, and, although Dr. Dickens admitted in her testimony that when this happens, it is a "fundamental principle" to then start transfusing blood, she further admitted that she did not do this.

¶8.    At 1:25 p.m., Alisha was taken to x-ray for cervical spine, and chest x-rays but while she was waiting to be placed on the CT machine, her respirations became more labored and rapid. Alisha was then returned to the emergency department, and on the way back, she stopped breathing. Her respirations were assisted with a bag valve mask. At 2:35 p.m., Alisha was again taken to CT, where she remained until 3:45 p.m., at which time she was taken to the holding room (preoperative area). At 3:52 p.m., she was taken to the operating room, where surgical procedures were performed by Dr. Briggs and Dr. McMillan. *Id.* During surgery, the decedent's heart stopped, and resuscitation attempts were unsuccessful. *Id.* Alisha was pronounced dead at 5:15 p.m.

**DISCUSSION**

I.    **Whether the Ambulance Service Defendants knew or should have known that River Oaks Hospital was not capable of managing Alisha's condition, and whether their actions in transporting Alisha to that hospital were only a remote cause of her death.**

**A. Standard of Review**

5

¶9. The standard of review for determining whether a motion for directed verdict should be granted is de novo. *Windmon v. Marshall*, 926 So. 2d 867, 872 (Miss. 2006). All evidence is considered "in the light most favorable to the non-movant, giving that party the benefit of all favorable inferences that may be reasonably drawn from the evidence." *Forbes v. GMC,* 935 So. 2d 869, 872 (citing *Cousar v. State,* 855 So. 2d 993, 998 (Miss. 2003)). If the Court finds that the evidence favorable to the non-moving party and the reasonable inferences drawn therefrom present a question for the jury, the motion should not be granted. *Pace v. Financial Sec. Life*, 608 So. 2d 1135, 1138 (Miss.1992). This Court has also held that "[a] trial court should submit an issue to the jury only if the evidence creates a question of fact concerning which reasonable jurors could disagree." *Vines v. Windham*, 606 So. 2d 128, 131 (Miss. 1992).

### B. Rule 50(a) Motion for a Directed Verdict

¶10. M.R.C.P. 50(a) provides guidelines for granting a directed verdict. Commentary following the rule states:

> In ruling on the motion for a directed verdict, the court should proceed along the same guidelines and standards that have governed prior peremptory instruction and directed verdict practice in Mississippi: the court should look solely to the testimony on behalf of the opposing party; if such testimony, along with all reasonable inferences which can be drawn therefrom, could support a verdict for that party, the case should not be taken from the jury.

See *White v. Thompson*, 310 So. 2d 914 (Miss. 1975); *Ezell v. Metropolitan Ins. Co.*, 228 So. 2d 890 (Miss. 1969); *Holmes v. Simon*, 71 Miss. 245, 15 So. 70 (1893).

6

## C. Duty and Breach

¶11.    The elements of a negligence suit, which are well-settled in Mississippi, are duty, breach of duty, causation, and injury. *Patterson v. Liberty Assocs., L.P.*, 910 So. 2d 1014, 1019 (Miss. 2004) (citing *Miss. Dep't of Transp. v. Cargile,* 847 So. 2d 258, 262 (Miss. 2003)).  The existence of a duty is clear and undisputed in this case.  Under the Central Mississippi Emergency Medical Services Protocol Manual ("EMS Protocol"), it is evident that Ming, Campbell, and REMS owed a duty to provide care and treatment to Alisha. Furthermore, under the standard for a Rule 50(a) motion, the trial court looked solely to the testimony on behalf of the appellant, and assumed, for the purposes of this ruling, that the Ambulance Service Defendants breached this duty by taking Alisha to River Oaks Hospital instead of University Medical Center (UMC).[1]

## D. Proximate Cause

¶12.    To prove the element of causation, both cause in fact and proximate cause must be shown.  *Patterson*, 910 So. 2d at 1019 (citing *Jackson v. Swinney,* 244 Miss. 117, 123, 140 So. 2d 555, 557 (1962)).  Proximate cause has been defined as "cause which in natural and continuous sequence unbroken by any efficient intervening cause produces the injury and without which the result would not have occurred." *Patterson,* 910 So. 2d at 1019 (quoting *Delahoussaye v. Mary Mahoney's, Inc.*, 783 So. 2d 666, 671 (Miss. 2001)).  Furthermore, to be held liable, a person "need not be the sole cause of an injury.  It is sufficient that his

---

[1]The emergency department UMC has Level I trauma care capability.

negligence concurring with one or more efficient causes, other than the plaintiff's, is the proximate cause of the injury." **Foster v. Bass**, 575 So. 2d 967, 992 (Miss. 1990) (*quoting Smith v. Dillon Cab Co., Inc.,* 245 Miss. 198, 205-06, 146 So. 2d. 879, 882 (1962)).

¶13.    In her testimony, Dr. Dickens, employed nine years as a full-time emergency room physician, stated that she was trained in ATLS. Dr. Dickens also testified that when someone is in hypovolemic shock, the correct procedure is to administer fluids to the patient, and then if vital signs continue to deteriorate, to administer blood.  She went on to admit that she feared Alisha was in hypovolemic shock and proceeded to administer fluids in an attempt to increase Alisha's vital signs.  However, the vital signs continued to deteriorate, and although Dr. Dickens admitted in her testimony that when this happens, it is a "fundamental principle" to then start transfusing blood, she further admitted that she did not do this.

¶14.    Dr. Carl Hauser, a surgeon and specialist in trauma and critical care, also stated on cross-examination that the practice of giving fluids and then blood if vital signs do not improve is "one of the basic tenets of ATLS" and that failing to transfuse blood was "violation of the standard" of care.  Therefore, it is clear by Dr. Dickens's own admission, along with Dr. Hauser's testimony, that Dickens was negligent in not transfusing blood in this situation, as a trained ATLS physician who should have known and admittedly did know that such procedures were the accepted standard in the medical community.

¶15.    Furthermore, Dr. Hauser's testimony made it clear that breaching the generally-accepted medical standard for the treatment of hypovolemic shock, this action became a

proximate cause of Alisha's death. Dr. Hauser stated that "the arrest would not have occurred . . . had the patient been electively intubated and given blood. He also stated that if blood had been given, Alisha would have tolerated the transfer to UMC for surgery if River Oaks had decided that such a transfer was needed. Furthermore, Dr. Hauser stated that if Alisha had been transported to UMC, she "would have survived with a very high likelihood, greater than ninety percent . . . depending upon exact timing and so forth."

¶16. Dr. Vernon Henderson, another expert witness offered by the plaintiff-appellant, reiterated Dr. Hauser's statements regarding Dr. Dickens's and River Oak's negligence in their treatment of Alisha. As a general surgeon with a special interest in trauma surgery, Henderson stated that before Alisha arrested, she had a ninety-five percent or better chance of surviving. Taken along with Dr. Hauser's testimony – that but for the failure to give blood, Alisha would not have arrested – it is clear that this failure to follow proper ATLS procedures was a proximate cause of Alisha's death. Furthermore, even if she had arrested and surgery was performed in a timely fashion, Henderson stated that "her chances were better than eighty percent" for survival.

¶17. The Ambulance Service Defendants argue that, even assuming they were negligent in transporting Alisha to River Oaks, they escape liability because they could not have foreseen that Dr. Dickens would have deviated from the standard of care. However, Entrican asserts that River Oaks was not capable of handling Alisha's condition and that everyone in

the medical community was well aware of that fact. Therefore, Entrican alleges that any negligence on the part of River Oaks or its physicians was foreseeable.

¶18. Several witnesses for Entrican testified that River Oaks did not have trauma care capability and that this was common knowledge in the Jackson area. Steven Eskridge, a paramedic and expert qualified in the field of emergency medical services, stated that River Oaks did not have the personnel on hand to immediately take care of trauma patients. Dr. Reginald Martin, a general surgeon, testified that River Oaks was "certainly not the ideal place for a multi-system trauma patient. . . . There is only one place in this area where Alisha Peavy belongs, and that's at the University of Mississippi Medical Center. Therefore, Entrican argues that because the Ambulance Service Defendants knew or should have known that River Oaks was not capable of handling the types of injuries that Alisha sustained, negligence on the part of River Oaks's physicians when attempting to treat her injuries was foreseeable and concurrent with the Ambulance Service Defendants' negligence in causing Alisha's death.

¶19. In response, the Ambulance Service Defendants assert that when delivering Alisha to River Oaks, they were placing her in the care of a hospital with a twenty-four hour emergency department and a ATLS-trained emergency department physician in Dr. Dickens. Dr. Dickens had been certified three different times in ATLS training and testified that during her time as an emergency department physician, she has seen many patients in shock. The Defendants argue that because ATLS procedures are generally accepted and well-known

throughout the medical community and because of the training and years of experience that Dr. Dickens had with shock patients, it was unforeseeable that Dr. Dickens would fail to administer the proper treatment of giving fluids and then blood in response to Alisha deteriorating vital signs.

¶20.    EMS Protocol includes a section entitled "Choosing a Hospital Destination" which aids paramedics in making a determination as to which hospital a patient should be transported.   The Protocol states that severe  or multisystem trauma patients with a trauma score of ten or less should be transported directly to a hospital with the equivalent of Level I or II trauma center capabilities.  This paragraph also states that the mortality rate for these patients increases dramatically if there is a delay in reaching the trauma center.  However, it is undisputed that Alisha's trauma score never reached ten or  below while en route to the hospital.  Rather, Alisha's initial score was thirteen at the accident scene and dropped  to twelve while in the ambulance.   Therefore, Ambulance Service Defendants argue that this requirement did not apply to their determination of the proper hospital destination.  Ming testified that due to the seriousness of Alisha's condition, UMC was considered when the ambulance initially left the accident scene.  However, Alisha's deteriorating condition, as well as traffic flow problems between River Oaks Drive at Lakeland Drive and UMC at noon on a weekday, weighed against the continuing transport to UMC.  Ming testified that he noticed that in a short period of time Alisha's mental status and vital signs changed, increasing her need of emergency treatment by a physician.  Therefore, they transported

Alisha to the closest facility that could stabilize her, which was River Oaks. Ming testified that in making this decision, he knew that River Oaks could do more for her than he could do, as River Oaks would be able to give blood products and stabilize her vital signs.

¶21. Dr. Rick Carlton, Medical Director for the Central Mississippi EMS District, who is responsible for writing the protocols, testified that as Alisha's trauma score never reached ten while en route to the hospital, the requirement to transport her to a level I or II trauma center did not apply. Rather, Dr. Carlton testified that the Section of the protocol on "Emergencies" was applicable, which states that "[e]mergency patients should be transported directly to the nearest hospital capable of managing their emergency condition. However, the patient's (and family's) hospital preference must be considered when making this decision." Dr. Carlton further testified that after reviewing the evidence in this case, it was his opinion that the Ambulance Service Defendants met the standard of care required of them in this situation. Dr. Carlton also testified that the trauma system in 1998 was dramatically different from the system which is in place today. He testified that, at the time of the incident, there was no organized system for accessing hospitals with the proper capabilities for the care of trauma patients. Dr. Carlton stated, at the time of Alisha's accident there was no way to know that a given hospital would have a problem treating a certain category of patient. Dr. Carlton also testified that, at the time of this incident, neither River Oaks nor anyone associated with River Oaks had made a request to the EMS office or online Medical Control regarding not bringing trauma of any kind to River Oaks.

12

¶22. However, in Ming's statement, which was written a couple of hours after Alisha was taken to River Oaks, Ming stated that Dr. Dickens advised him that River Oaks could not handle this type of trauma and that the surgeon (Dr. Briggs) was on call. Ming told Dr. Dickens that the patient's guardian requested the facility and because of Alisha's deteriorating condition, River Oaks was the closest facility to stabilize her. Ming further stated that he thought River Oaks had the capability to stabilize the patient. When Dr. Briggs arrived, he asked which ambulance brought Alisha to the hospital and why it did so. Ming responded as he had to Dr. Dickens. Dr. Briggs told Ming that River Oaks could not handle this type of trauma and that he should have transported Alisha to UMC, as they had the staff to treat this type of patient. Dr. Briggs further stated that Ming "probably did more harm than good for the patient." Dr. Briggs advised Ming to explain to the family that Alisha should have gone to UMC with this type of trauma. Additionally, the EMS protocol states that when making a hospital destination decision, a paramedic should "contact medical control if there is any doubt as to which hospital a patient should be transported to." On cross-examination, Ming stated that he did not call Medical Control prior to transporting Alisha to River Oaks to seek their input as to which hospital she needed to go to.

¶23. Additionally, testimony showed that while Ming was primarily responsible for the decision to transport Alisha to River Oaks, Alice Little, Alisha's grandmother, who was with her in the ambulance, concurred with this decision. Acting according to EMS protocol, Ming was required to consult with Little about her wishes for Alisha's treatment. Little advised

13

Ming that she wanted Alisha to be taken to Methodist North, which is where Alisha's baby was to be delivered. Ming explained that Methodist North did not have an emergency room, and therefore, in his opinion, was not a appropriate option considering Alisha's severe condition. Ming advised Little that because Alisha's mental status and vital signs were diminishing, the ambulance should proceed to the closest hospital with an emergency room so emergency treatment could begin. At this point, Little gave her consent to take Alisha to River Oaks. Ming radioed River Oaks to inform the staff of the status of the patient he was bringing to the hospital. At this time, River Oaks made no attempt to divert the ambulance to another hospital or inform Ming that they were not equipped to handle Alisha's condition.

¶24. "The law dealing with the duty to foresee the imprudent acts of others appears under the general rubric of the jurisprudence of 'intervening cause.'" *Southland Mgmt. Co. v. Brown by & Through Brown*, 730 So. 2d 43, 46 (Miss. 1998). The Second Restatement of Torts defines a superseding cause as "an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." *Id*. (*citing* Restatement (Second) of Torts § 440 (1965 )). Under this theory, an original actor's negligence may be superceded by a subsequent actor's negligence, if the subsequent negligence was unforeseeable. *Southland Mgmt. Co.,* 730 So. 2d at 46. However, merely finding that the negligence of River Oaks, by and through Dr. Dickens, was an intervening cause in the chain of events leading from the Ambulance Service Defendants action in transporting Alisha to River Oaks

14

to Alisha's death is not sufficient to render the Ambulance Service Defendants' earlier actions non-actionable. *Id.* Instead, this Court has held that if "the intervening cause is one which in ordinary human experience is reasonably to be anticipated, or one which the defendant has reason to anticipate under the particular circumstances," the subsequent actor's negligence is foreseeable and does not break the chain of events between the negligence of the first actor and the injury. *Id.* (*citing* W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 44 (5th ed. 1984)). As such, under principles of "foreseeability," a defendant may be held liable for his failure to anticipate an easily-predicted intervening cause and to properly guard against it. *Id.* *See also* **Pargas of Taylorsville, Inc. v. Craft**, 249 So. 2d 403, 408 (Miss. 1971) (holding that a defendant is chargeable only with *anticipating reasonable probabilities,* therefore a person is not bound to anticipate the unusual, improbable, or extraordinary occurrence, although such happening is within the range of possibilities (citation omitted)).

¶25. Notwithstanding, this Court also has held that "negligence which merely furnished the condition or occasion upon which injuries are received, but does not put in motion the agency by or through which the injuries are inflicted, is not the proximate cause thereof." **Robison v. McDowell**, 247 So. 2d 686,688 (Miss. 1971) (*quoting* **Hoke v. W.L. Holcomb & Assoc., Inc.**, 186 So. 2d 474 (Miss. 1966); **Mississippi City Lines, Inc. v. Bullock,** 194 Miss. 630, 13 So. 2d 34 (1943)).[2] Thus, "[i]f the act complained of is only a remote cause, superseded

---

[2]Stated differently, these cases hold that "negligence is remote and non-actionable which merely causes a person to be at a particular place at a particular time where such

15

by an independent, efficient intervening cause that leads in unbroken sequence to the injury, the original negligent act is not a proximate, but a remote, cause. Thus, not being foreseeable, the original cause is not actionable." *Robison,* 247 So. 2d. at 689. In *Robison*, a driver pulled a tractor out into a highway and blocked both lanes of travel. As a result, the injured party was required to stop his vehicle. *Id.* While the injured party was stopped, a second vehicle hit him from behind. The driver appealed the judgment entered in favor of the injured party. *Id.* This Court found that although the jury was justified in finding that the driver negligently pulled the tractor out into the highway, his negligence was not the proximate cause of the accident. *Id.* at 688-689. Rather, the intervening negligence of the second operator superceded that of the driver, thus rendering the driver's negligence a remote cause. *Id.* at 688-689. Additionally, this Court stated that "[t]he question of superceding intervening cause is so inextricably tied to causation, it is difficult to imagine a circumstance where such issue would not be one for the trier of fact." *O'Cain v. Harvey Freeman & Sons, Inc.,* 603 So. 2d 824, 830 (Miss. 1991).

¶26. While the trial court ruled that the alleged negligence of the Ambulance Service Defendants in transporting Alisha to River Oaks rather than to another hospital could be only a remote cause of Alisha's death, we find that there is evidence in the record to support the arguments for both sides, thereby creating a question for the jury. Therefore, whether the Ambulance Service Defendants knew or should have known that River Oaks was not capable

---

person is injured as a result of the negligent act of another, who puts in motion a different and intervening cause which efficiently leads in unbroken sequence to the injury." *Id.*

16

of managing Alisha's condition and whether their alleged negligence, if any, in taking her to that hospital was only a remote, and thus not proximate, cause of her death, is question to be determined by the jury. We suggest no opinion on the merits of Entrican's claim or her ability to meet the requisites of a negligence action. We find only that the directed verdict in favor of the Ambulance Service Defendants was not proper, as the issue of causation in this case is a jury question. Accordingly, we remand to the trial court to submit this issue to the jury in accordance with this opinion.

## CONCLUSION

¶27. For the foregoing reasons, the directed verdict is reversed and this case is remanded to the trial court.

¶28. **REVERSED AND REMANDED**.

**WALLER AND DIAZ, P.JJ., EASLEY, CARLSON, DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR. GRAVES, J., NOT PARTICIPATING.**