623 So.2d 955 (1993)
Sally Ann STONECIPHER, Reilly Stonecipher and Mary Lee Stonecipher,
v.
William KORNHAUS, An individual, William Moorman, An individual, and Blackshear and Kornhaus, Inc.
No. 90-CA-0719.
Supreme Court of Mississippi.
June 17, 1993.
As Modified on Denial of Rehearing October 7, 1993.
*956 Ben F. Galloway, III, Owen Galloway & Clark, Tim C. Holleman, Gulfport, for appellant.
Roger T. Clark, Bryant Clark Dukes Blakeslee Ramsay & Hammond, William E. Whitfield, III, Bryant Clark Firm, Owen T. Palmer, Jr., Gulfport, for appellee.
Before DAN M. LEE and PRATHER, P.JJ. and PITTMAN, J.
PITTMAN, Justice, for the court:
This is an appeal from the Harrison County Circuit Court wherein summary judgment was granted to the appellees William Kornhaus, William Moorman and Blackshear and Kornhaus Real Estate Brokerage. The appellants Sally Ann, Reilly and Mary Lee Stonecipher's initial complaint alleged that real estate which they purchased from the appellees contained a tree in a defective condition, which resulted in serious injury to Mary Lee Stonecipher and her unborn child, Sally Ann. In the alternative, the appellants argued negligent misrepresentation. Following discovery, the appellees filed a motion for summary judgment, which was granted after the court heard oral arguments. We hereby affirm the lower court's decision, and hold that the Stoneciphers' acceptance of the "as is" clause found in the sales contract precludes them from maintaining an action against Kornhaus and Moorman, who had transferred ownership and control of the premises five months prior to the accident.

I.
The facts of this case rival many of the hypothetical questions tested on law school examinations. Up until several months prior to the accident, Reilly and Mary Lee Stonecipher lived in New Orleans, Louisiana with their two daughters, Lauren and Amy. However, the Stoneciphers decided to relocate to the Mississippi Gulf Coast and soon began looking at property in the Pass Christian area. They contacted a local realtor, Julien Byrne, who was recommended by Mrs. Stonecipher's parents, who reside in Pass Christian. On August 15, 1985, Byrne showed the Stoneciphers several properties along what is known as Scenic Drive, which is the beachfront property along Highway 90 in Pass Christian. As Mr. Byrne drove past the property which is the subject of this litigation, he stated that the property was owned by William Kornhaus and William Moorman and had been placed on the market several times in the past.
After the Stoneciphers showed their interest in the property, Byrne stopped and allowed them to view the property. Neither Kornhaus nor Moorman were at the house, as both live on farms in nearby Pearlington, Mississippi. The Stoneciphers were able to peek into the windows to get a general idea of the house. They both admired a very old *957 and large oak tree in the front yard, noting that it added a sense of elegance to the property. They noticed one of the limbs which reached over the driveway had a cable attached to it from another limb up above. It was this limb that would eventually fall on Mary Lee Stonecipher, injuring both Mary Lee and her unborn child.
Apparently the Stoneciphers really liked the house. However, they realized that it would take quite a bit of renovation to get the house in the condition that they desired. Therefore, Byrne arranged for the owners to show the Stoneciphers the entire house and property. The appellants brought a contractor with them in order for him to estimate the renovation costs. After this inspection, the Stoneciphers were sure that they wanted to buy the house. However, an unexpected hurricane developed in the Gulf of Mexico, and was heading for the Mississippi Gulf Coast. Rather than going ahead and submitting an offer to the owners, the Stoneciphers decided to wait until after Hurricane Elena passed and assuming that the property survived the storm, they would submit their offer.
After the hurricane hit on September 2, 1985, Reilly asked Mary Lee's parents, the Stinsons, to pass by the property to see if any damage had been done to the house. The Stinsons reported that like the rest of Scenic Drive, there were a lot of tree limbs down in the front yard, but as far as they could tell the house did not suffer any major structural damage. Upon receiving this news, the Stoneciphers dispatched an offer via courier to the realtor, Byrne. Within a few days, the appellees Kornhaus and Moorman accepted the offer, subject to certain conditions. The first was that the sale not be closed until January, 1986, for tax reasons. The second was that the Stoneciphers would have to agree with certain conditions on the sales contract.
The weekend following the hurricane, the Stoneciphers met with Kornhaus and Moorman to discuss signing a sales contract. It was on this visit that the question of the tree in front of the house was first raised. While on a tour of the house, Reilly and Mary Lee were shown the view from the upstairs front balcony by Mr. Kornhaus. While on the balcony the conversation turned to the beauty of the stately oak tree spanning the front yard. It was at this point Mary Lee Stonecipher commented about the cable they had seen previously securing two limbs, (the cable was now broken, evidently as a result of the hurricane). Mrs. Stonecipher recounted the discussion as follows:
"The  either the day we signed the contract, we met with Mr. Kornhaus and Mr. Moorman and they showed us through the house or the day after that. It was that week. You know, once you sign the contract, then the owners get together with the buyers and they show them through the house and tell them all the things about the house ...
My husband, Mr. Kornhaus and I, I'm not sure if Mr. Moorman was there or not, walked out on to the front balcony upstairs porch. We first all remarked what a pretty view it was. And then Mr. Kornhaus said to us without  he volunteered to us without our asking that he would prune the trees. And he said that he has a black man, an old black man from Waveland that usually does it, he does it the old fashioned way.
And I pointed to that cable at that moment and I said, and this is my exact words, "You better fix that cable immediately." And he replied, "You don't have to worry about that, the cable is not there to keep the limb from falling, it's there to keep it from growing into the house. And as you can see, it's not growing into  that's not a problem." I looked, I could see that that was not a problem. And I didn't think about it after that. I took his word for it."
Reilly's account of the conversation concerning the wire was basically the same as his wife's. However, Reilly claims that prior to the conversation concerning the cable, Mr. Kornhaus stated that some of the branches were torn and that they needed to be cut off and sealed and that he would have that done before the Stoneciphers moved in. However, like every story, there are two sides. In Mr. Kornhaus's deposition, he stated that he assumed the cable was there to prevent the limb from growing under the front gallery. *958 He denies that he made any sort of affirmative statement as to why the cable was present in the tree.
Neither party could pinpoint exactly when or why the cable was put in the tree. However, Mary Catherine Ward, a member of the Hanson family, remembers the cable being in the tree when she lived in the house during the 1930's and 1940's.
Following that meeting at the house, the Stoneciphers took the sales contract home with them to consider the proposed terms. One of these proposed terms which was hand written at the bottom of the sales contract was an "as is" provision which stated as follows:
"It is understood and agreed that the property is sold in "as is" condition without any warranty whatsoever as to the state of condition of the improvements on the property."
After consideration of the transaction, the Stoneciphers signed the sales contract on September 12, 1985. Reilly claims that there were four items that Kornhaus agreed to do in conjunction with the sale of the property, but they were not included in the actual sales contract. These included the pruning and sealing of the trees which were damaged as a result of Hurricane Elena, the fixing of an upstairs leaky roof, the leaving of the curtains, and leaving of a swing on the property. Reilly, an attorney in New Orleans, conceded that since he did not get these promises in writing that he might have a difficult time enforcing them. However, when Reilly asked Kornhaus about the trees and the roof during the interim time between the signing of the sales contract and the closing at the first of the year, he was told that there was a shortage of workers due to the hurricane, and that he was on a waiting list. In December, Reilly called Kornhaus to check on the progress of the roof and trees and was told that someone was in the process of repairing the roof, but that Kornhaus had still not found anyone to work on the trees. A week prior to the January 3, 1986 closing, Reilly went to the property where he noticed that all the curtains had been removed. However, since he did not get this promise in writing, he did not raise this issue.
At the January closing, the sellers, Kornhaus and Moorman, executed a General Warranty Deed in order to convey the premises to the Stoneciphers. This warranty deed also included a provision that the improvements were to be conveyed in "as is" condition. Reilly stated that he interpreted this "as is" provision pertaining to "improvements" as encompassing the house only and not the land. Kornhaus stated that this provision was suggested by his realtor because the house needed quite a bit of renovation. Three days following the closing, the Stoneciphers moved into the house. Renovations began immediately to the cottage in back of the house in order to accommodate Reilly's mother who suffers from Alzheimer's disease. After the cottage was fully renovated, the workers began renovating the main house, which continued throughout the summer.
One of the workers renovating the house approached Reilly and told him that the trees on the property needed some work and that his brother could do this work for Mr. Stonecipher. The workman arranged for his brother and his brother's partner to view the trees and give Mr. Stonecipher an estimate for the work. Reilly agreed to have two large oak trees pruned and sealed for a price of $500. One of these trees was the one that eventually fell on Mary Lee. For some reason, the workers were unable to perform the tree work when they had originally planned, but rescheduled to do the work the next weekend. However, it was not soon enough.
The afternoon of June 19, 1986, was sunny with very little breeze blowing in the air. Mary Lee Stonecipher decided that she and her two daughters would go to the grocery store. Upon leaving the house, the three proceeded to walk down the driveway to their car, Mary Lee walking a few steps in front of the girls. When Mary Lee walked under a large limb of the stately oak tree, she heard a cracking noise and immediately looked up. Seeing that the limb was falling, she yelled at the children to stop. Being seven and a half months pregnant, Mary Lee was not able to escape the falling limb, as it fell on top of her. She landed face down on the driveway with the limb lying on her *959 pelvic region. Mary Lee immediately began screaming for help, while the children began crying. Luckily two workmen who were inside the house heard the crackling of the tree and felt the limb's impact when it hit the ground. Upon hearing the screaming, they immediately dashed through the house with such force that they broke a pane of glass in the new french doors when bursting through them.
When the workers reached Mary Lee, they tried to lift the limb from off of her, but were unsuccessful due to its weight. One of the workers retrieved a wooden beam from the work site and pried the limb off of Mary Lee just enough to allow the other worker to pull her out from under the fallen limb. Mary Lee remembers one of the workmen standing over her praying. Emergency personnel were called and the fire department and an ambulance responded to the scene. Mary Lee was rushed to Memorial Hospital in Gulfport, where an emergency Caesarean section was performed. Realizing that the female child had suffered severe neurological damage, Sally Ann was flown via helicopter to Ochsner Clinic in New Orleans for treatment. When Reilly arrived at the Gulfport hospital from New Orleans, he saw his wife as she was going into surgery. Mary Lee had suffered severe injuries to her pelvic region, and the doctors were not sure that she would pull through. Following a successful operation, Mary Lee developed problems with blood clots, necessitating a special type of surgery which only two doctors in the nation could perform. Fortunately, one of these two doctors taught at LSU School of Medicine in New Orleans. Following a successful surgery and quick recovery, Mary Lee still experienced some pain in her left leg.
The newborn daughter, Sally Ann, was not so fortunate. The accident resulted in severe brain damage and cerebral palsy, which causes the young daughter to lose control of major muscle groups in her body. The result is severely painful muscle spasms and an arching of her head in a backward direction. To control these painful spasms, Sally Ann must be given constant valium, phenobarbital, and chloralhydrate. After several months in Ochsner Clinic, Sally Ann was allowed to join her family in Pass Christian. However, since Mary Lee was still recovering from her own injuries, the Stoneciphers had to hire a full time nurse to care for Sally Ann. When they began to have trouble feeding her, she was returned to Ochsner where a gastro tube was placed down Sally Ann's throat in order to nourish her. To this day, this remains her only means of nourishment.
After Mary Lee was initially taken to the hospital, the workers and Reilly were able to inspect the fallen tree limb. The limb had broken off where it met the trunk. An inspection of the fallen limb revealed that the center of it was rotten and housed a bee hive. When the limb fell, the bees began swarming around the area, and continued to do so for several days, which initially hindered the emergency personnel's ability to treat Mary Lee.
Prior to this accident, there was no indication that the limb was unstable. Both the buyers and the sellers believed that the limb was a vibrant and healthy limb, as evidenced by its branches containing green leaves and its healthy bark. The rotten core in which the bees lived only measured about a foot and a half in length, but it was in the pivotal area where the limb attached to the trunk of the tree. John Davis, a horticultural specialist with the Mississippi State University Cooperative Extension Service, inspected the tree after the accident and remembered talking with either Kornhaus or Moorman on a prior occasion when he was told that a barn owl lived in a five to six inch cavity where the limb met the tree trunk. Dale Greenwell, a private investigator who interviewed the appellees after the accident, stated in an affidavit that the appellees were aware that a barn owl lived in the cavity of the tree.
The man whom Reilly had talked with about trimming the trees, Larry Beniot, stated that he saw the nest of honeybees in the limb when he gave Reilly the estimate, but stated that the presence of the bees did not mean that the limb was hollow. Beniot stated that he would have to get up in the tree to make a further assessment. He did tell Reilly that he needed to get rid of the bees, as they could destroy the tree. It was his *960 opinion that the weight of the limb needed to be reduced, since the cable was no longer there to support the heavy limb.
Apparently the fallen tree limb was cut up and hauled off by Larry Beniot within a few days of the accident. The men also pruned and sealed the trees as they were scheduled to do originally. The workers noted that the limb weighed so much that when it hit the ground, it left a big imprint in the soil. A week prior to Mary Lee's return home from the hospital, she voiced her concern about the tree. She asked that they get a second opinion to insure that the tree was healthy. Jessie Cuevas was called to perform this task. Cuevas met Shirley Stinson, Mary Lee's mother, at the house and she showed him the tree. When Cuevas inspected the tree, he told Mrs. Stinson that he had told the previous owners that the branch was in bad condition and needed work. Apparently when Cuevas gave the former owners an estimate for the proposed work, Kornhaus stated that the price was too high and that he would allow the new owners to fix it. Cuevas proceeded to further prune and seal the tree.
Following the trial judge's granting Kornhaus, Moorman and Blackshear and Kornhaus, Inc.'s motion for summary judgment, the Stoneciphers appeal on the following grounds:
I. THE TRIAL COURT IMPROPERLY APPLIED THE GENERAL RULES UNDER RULE 56, MISSISSIPPI RULES OF CIVIL PROCEDURE, IN REVIEWING THE EVIDENCE ON APPELLEE'S MOTION FOR SUMMARY JUDGMENT AND GRANTING THE SAME.
II. THE TRIAL COURT ERRONEOUSLY GRANTED SUMMARY JUDGMENT ON ADMITTEDLY "DISPUTED" FACTS AND/OR IGNORED "DISPUTED" FACTS CONCERNING AN "UNDISCLOSED DANGEROUS CONDITION KNOWN TO" VENDORS/APPELLEES.
III. THE TRIAL COURT ERRONEOUSLY GRANTED SUMMARY JUDGMENT ON "DISPUTED" FACTS CONCERNING THE "NEGLIGENT MISREPRESENTATIONS" OF APPELLEES.
IV. THE TRIAL COURT ERRED IN ALTERNATIVELY FINDING THAT THE "AS IS" CONDITION TRANSFER OF THE PROPERTY MUST BE ENFORCED IN SUSTAINING APPELLEES' MOTION FOR SUMMARY JUDGMENT.

II.
This Court employs a de novo standard of review in reviewing a lower court's grant of a summary judgment motion. Short v. Columbus Rubber & Gasket Co., Inc., 535 So.2d 61, 63 (Miss. 1988). This entails reviewing all the evidentiary matters in the record: affidavits, depositions, admissions, interrogatories, etc. The evidence must be viewed in the light most favorable to the Stoneciphers, and they are to be given the benefit of every reasonable doubt. Smith v. Sanders, 485 So.2d 1051, 1054 (Miss. 1986); Dennis v. Searle, 457 So.2d 941, 944 (Miss. 1984). A motion for summary judgment lies only when there is no genuine issue of material fact, and the moving party is entitled to a judgment as a matter of law. M.R.C.P. 56(c). This Court does not try issues on a Rule 56 motion, but only determines whether there are issues to be tried.
The appellant Stoneciphers argue that the trial court erred in granting summary judgment since there were material facts in dispute and that the court failed to view the facts in the light most favorable to the plaintiff/appellant Stoneciphers. One of the disputed facts involves a conversation on the upstairs balcony of the house in which the broken cable was discussed. The Stoneciphers contend that Kornhaus told them that they need not worry about the broken cable in the tree, since it was only there to prevent the tree from growing into the house. Kornhaus, on the other hand, recalls telling them that he only assumed that the cable was present for that purpose. Another area of dispute revolves around whether the appellees Kornhaus and Moorman had *961 knowledge of the condition of the tree before the house was sold to the Stoneciphers. Kornhaus and Moorman deny any prior knowledge of the limb being in a decaying state. However, there was evidence presented in depositions that tended to show that the appellees in fact knew about the tree's weakened condition.
First, there was a statement to a horticulturalist with the Mississippi State Cooperative Extension Service that one of the appellees told him that the tree contained a five to six inch cavity in the area where the limb broke, in which a barn owl lived. Next there was a statement by Jessie Cuevas, a local tree trimmer, that he had inspected the tree after the hurricane but prior to the sale and told Kornhaus that the limb needed to be worked on immediately. Kornhaus allegedly responded that Cuevas's estimate was too expensive, and that he would leave the limb for the new owners to fix.
In granting Kornhaus and Moorman's motion for summary judgment, the lower court concluded that:
This Court simply cannot glean any material misrepresentation on the part of the defendant, Kornhaus, and that there is absolutely no showing that the defendants could have known of the apparent compromise in the structural integrity of the tree prior to this accident short of destructive examination or specialized knowledge.
That the parties had the same level of appreciation of the risk involved, that is to say that the faculties, experience and knowledge of the Stoneciphers are no different than those of Kornhaus and Moorman ...
That there was no evidence that Kornhaus and Moorman knew or had any knowledge of the condition of this tree which was not openly apparent to all parties.
That there was no evidence that Kornhaus and Moorman actively concealed anything from the Stoneciphers, since the concealment was accomplished by natural conditions of the tree itself.
That the latently deficient condition of the tree was a result of an "act of God."
That there was no negligent misrepresentation on the part of Kornhaus and Moorman, since no "fact" upon which a misrepresentation or omission could be found was made.
That there was no showing that the "assumption" made by Kornhaus concerning the cable was false.
That the "as is" language on the sales contract and warranty deed is controlling in this instance.
The trial judge determined that the traditional laws of property did not apply in this case, since the Stoneciphers were neither trespassers, invitees nor licensees to their own property. In granting summary judgment, the judge was persuaded by the logic of Great Atlantic and Pacific Tea Co. v. Wilson, 408 N.E.2d 144 (Ind. Ct. App. 1980). In Wilson, the Great Atlantic and Pacific Tea Company (A & P) had transferred possession and control over its leased premises to the landowner and, thereafter Wilson fell into a conveyer on the property and was injured. In finding A & P not liable, the Indiana Court of Appeals stated:
The general rule of law is that former possessors of land are not liable for injuries caused to others while upon the land by any dangerous condition, natural or artificial, which existed when the possession of the land was transferred ...
While this principle here expressed refers to vendors of land, it is broad enough to cover a former lessee who had relinquished his possessory interest in the premises. The rationale is grounded in the general policy which seeks to limit liability to persons in possession and control of a land. One who lacks possession and control of property normally should not be held liable for injuries which he is no longer in a position to prevent.
* * * * * *
A grantor of premises in a defective condition is generally not liable for an injury due to the defect but occurring after execution of the deed and delivery of possession to the grantee unless the grantor misleads the grantee into believing the premises are safe. This is true regardless of whether the injured person is the grantee *962 or a third person to whom the duty of care is owed by the grantee. The new owner, upon assuming control and possession, becomes responsible for the safety of structures erected by his predecessors.
Wilson, 408 N.E.2d at 147 (quoting Brock v. Rogers & Babler, Inc., 536 P.2d 778 (Alaska 1975)).
The appellants argue that Mississippi should adopt § 353 of the Restatement, (Second) of Torts, which imposes a duty on the vendor to disclose any known defects on the premises prior to its sale. This section states as follows:
§ 353 Undisclosed Dangerous Conditions Known to Vendor
(1) A vendor of land who conceals or fails to disclose to his vendee any condition, whether natural or artificial, which involves unreasonable risk to persons on the land, is subject to liability to the vendee and others upon the land with the consent of the vendee or his subvendee for physical harm caused by the condition after the vendee has taken possession, if
(a) the vendee does not know or have reason to know of the condition or the risk involved, and
(b) the vendor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to believe that the vendee will not discover the condition or realize the risk.
(2) If the vendor actively conceals the condition, the liability stated in Subsection (1) continues until the vendee discovers it and has reasonable opportunity to take effective precautions against it. Otherwise, the liability continues only until the vendee has had reasonable opportunity to discover the condition and to take such precautions.
Restatement (Second) of Torts § 353 (1977). It is important to note that this section of the Restatement requires that the vendor know of the condition, or have reason to know of it and realize that it involves an unreasonable risk of harm to those who may use the land in ignorance of it. To date, this Court has not adopted § 353, and even if we chose to do so, it cannot conclusively be shown that either Moorman or Kornhaus were aware of the limb's deteriorated condition, or that they possessed any superior knowledge or skill that would have alerted them to it.
The Mississippi cases dealing with latent defects either address the issue of defects in the title or deal with latent defects in the houses themselves. This case is different in that it deals with a latent defect on the property itself, as opposed to structural improvements made on the property. Therefore, the question we now face is whether an undiscovered latent defect present in a tree on the premises and alleged representations as to its condition were so material as to cause a grant of summary judgment to be erroneous.
The general rule is that a vendor of real estate is not liable to a purchaser in possession, or to any third party, which is caused by a dangerous condition on the premises, whether natural or artificial, which existed when the purchaser took possession. Hut v. Antonio, 95 N.J. Super. 62, 229 A.2d 823 (1967). This is based on the doctrine of caveat emptor, and although this doctrine has been eroded by the application of implied warranties concerning chattels, the rule has remained intact as to the sale of land. However, a few courts have imposed liability on sellers and agents of sellers of real estate who have concealed defects prior to sale. See Fennell Realty Co., Inc. v. Martin, 529 So.2d 1003 (Ala. 1988) (agent for vendor has duty to fully disclose all material facts to purchaser if questioned directly).

III.
This Court has not adopted § 353 of the Restatement, (Second) of Torts, and is in no way bound by it. Although the doctrine of caveat emptor has slowly been eroded with respect to real property in this state, it still exists in certain areas of Mississippi law. See O'Cain v. Harvey Freeman and Sons, Inc. of Mississippi, 603 So.2d 824 (Miss. 1992) (caveat emptor still applicable in certain landlord-tenant relationships); Hill v. Thompson, 564 So.2d 1 (Miss. 1989) (caveat emptor still applicable to foreclosure sales). In fact, subsequent purchasers are now able to maintain causes of action against home *963 builders. See Keyes v. Guy Bailey Homes, Inc., 439 So.2d 670 (Miss. 1983).
In addressing the issue at hand, Kornhaus and Moorman assert as their defense the presence of an "as is" clause found in the sales contract signed by the Stoneciphers, thereby exempting the appellees from any liability pertaining to the condition of the premises. The exact language is as follows:
It is understood and agreed that the property is sold in "as is" condition without any warranty whatsoever as to the state of condition of the improvements on the property.
This "as is" provision was not mere boilerplate language buried deep inside the contract, but was specifically handwritten by Kornhaus in the blank area labeled "Special Provisions." Mr. Kornhaus stated that he inserted this provision in the sales contract at the suggestion of his realtor since the house was in need of renovation. The Stoneciphers' actions showed an acknowledgement that the property needed renovation when they enlisted the services of a contractor to view the house with them the first time they fully inspected it.
In Koch v. H & S Development Company, 249 Miss. 590, 163 So.2d 710 (1964), we held that:
While the appellee is not the owner of the property involved, he stands in the shoes of the owner and what equity does to a lessor, equity may also do to an owner. The owner or lessor of property, when he contracts with a buyer or lessee, should be able to rely upon the simple, mutually agreed upon terms of the contract, as should the buyer and lessee. The terms of the contract when fulfilled or breached should decide if possible the rights of the parties. The rule of caveat emptor, as yet, is still operative.

249 Miss. at 629, 163 So.2d at 727. (Emphasis added). The literal and mutually agreed upon language of the "as is" provision as well as that of the "Acceptance" provision also found in the sales contract refutes the Stoneciphers' argument that the "as is" provision only applies to improvements on the property and not natural conditions themselves. The acceptance provision reads as follows:
12. ACCEPTANCE: The Buyer hereby represents that he has personally inspected and examined the above mentioned premises and all improvements thereon and accepts the property in its as is and present condition. Neither party has relied upon any statement or representation not embodied in this contract made by the other party or the sales representative bringing the parties together.
(Emphasis added). This acceptance provision clearly states that the buyers examined the entire premises, including the improvements, and that neither party was to be bound by any representations made by the other party. Reilly Stonecipher, a Harvard law graduate and practicing attorney, signed the sales contract containing the "as is" clause and is therefore bound by the mutually agreed upon terms of the contract. Both the handwritten "as is" provision and the acceptance provision found in the sales contract appear to be consistent in their intent and should therefore be honored.
Another bar to the Stoneciphers' suit is that they had sole possession and control of the property in question for five months up until the unfortunate accident. Five months certainly is ample time to fully inspect both the property and its improvements for defects. The tree did not decay overnight, but was the result of a slow, on-going process. A strong argument could be made that the Stoneciphers were put on notice when they first observed that the cable had been broken by the hurricane. If not then, they were put on notice when one of the workman renovating the house told Mr. Stonecipher that the trees in his yard needed some work and that his brother was in the tree-trimming business. This hazardous condition was not created by either Kornhaus or Moorman, and the Stoneciphers were in just as good a position as the appellees to discover the decaying condition of the tree. Although Kornhaus was in the real estate business, he did not possess any superior knowledge which would have allowed him to discover the tree's decaying condition.
Finally, since the Stoneciphers had total possession and control of the property at the *964 time of the accident, they would have been liable to third parties if the limb had fallen on them, as opposed to Mrs. Stonecipher. Shifting liability back to the vendors Kornhaus and Moorman based solely on the fact that the injured party was Mrs. Stonecipher would be highly inequitable. Had the injured person been anyone else other than the owners, the owners would be liable.

IV.
In First Money, Inc. v. Frisby, 369 So.2d 746 (Miss. 1979), this Court stated:
The basis for damages resulting from negligent misrepresentation is the lack of care; the basis for damages resulting from fraud is the want of honesty. See Restatement of the Law of Torts (Second) sections 549 and 552 (1977). The lack of care in negligent misrepresentation and the want of honesty in fraudulent misrepresentation in business transactions give rise to distinctive causes of action, the one in tort, the other in fraud.
Id. at 750. However, in order to recover for negligent misrepresentation, a plaintiff must prove by a preponderance of the evidence:
(a) A misrepresentation or omission of a fact;
(b) That the representation or omission is material or significant;
(c) The failure to exercise reasonable care on the part of the defendant;
(d) Reasonable reliance on the misrepresentation or omission; and
(e) Damages as a direct result of such reasonable reliance.
Berkline Corp. v. Bank of Mississippi, 453 So.2d 699, 702 (Miss. 1984).
Despite the Stoneciphers' attempt to show that Kornhaus's alleged statement as to why the cable was in the tree was a material misrepresentation and that their reliance upon it led to Mary Lee's and Sally Ann's injury, it falls short of the Berkline standard. In Berkline, a defendant bank having superior knowledge of a depositor's credit information supplied erroneous information to a furniture manufacturer who relied on this information when it extended a line of credit to a retail outlet. Even though Kornhaus is engaged in the business of selling real estate, he had no superior knowledge over the Stoneciphers with respect to the decaying tree. Finally, the "Acceptance" provision found in the sales contract clearly states that neither party has relied upon any statement or representation made by the other party.
Therefore, by the Stoneciphers executing the sales contract and agreeing to the "as is" and "acceptance" provisions and the added fact that they had been in possession several months, they are precluded from maintaining this action against Kornhaus and Moorman for negligent misrepresentation and the selling of property to them in a defective condition. While the serious injuries suffered by Mrs. Stonecipher and her infant daughter are most regrettable (and permanent in the daughter's situation), sympathy alone cannot avail as a foundation for liability and recovery. The lower court judge's decision is hereby affirmed.
AFFIRMED.
HAWKINS, C.J., PRATHER, P.J., and ROBERTS and SMITH, JJ., concur.
DAN M. LEE, P.J., concurs in result only.
BANKS, J., dissents with separate written opinion joined by SULLIVAN and McRAE, JJ.
McRAE, J., dissents with separate written opinion joined by SULLIVAN, J.
BANKS, Justice, dissenting:
I agree with Justice McRae that Restatement (Second) of Torts § 353 (1977) states the appropriate standard and that there are genuine issues of material fact as to whether the standard was met. It follows that summary judgment was inappropriate. I would therefore reverse.
SULLIVAN and McRAE, JJ., join this dissent.
McRAE, Justice, dissenting:
Having reviewed the record in this case, I am persuaded that the majority, like the trial judge, has reached too many conclusions of its own about genuine issues of material fact *965 which should have been placed before a jury. The majority and the trial judge have forgotten the simple principle: If there are conflicts in facts, let the jury decide  not a judge. Moreover, I disagree with the majority's exclusive focus on the claims of Reilly and Mary Ann Stonecipher, without any regard for those of the primary plaintiff and appellant, Sally Ann Stonecipher, an infant whose claim is separate and distinct from that of her parents. Accordingly, I dissent.
In affirming the lower court's grant of summary judgment, the majority dismisses the claims not only of Reilly and Mary Lee Stonecipher, but also those of the infant, Sally Ann Stonecipher. Born prematurely just hours after the tragic accident, Sally Ann sustained serious and permanent brain damage when a massive tree limb fell and crushed her mother's pelvis. Sally Ann, who will never be able to play under the old oak tree or follow in the footsteps of her Harvard-educated father, did not have an opportunity to inspect the tree or hear any representations as to its condition, did not sign an "as is" contract and will never understand what "as is" meant. Under today's decision, she is now precluded from any cause of action by a majority which barely sees fit to even mention her name in its lengthy opinion.[1] At the time of the accident, Sally Ann, though still in her mother's womb, was a living, breathing human being. Accordingly, she has a separate cause of action, independent from the claims of her parents.
Reilly and Mary Lee Stonecipher, as parties to the contract, may be bound by the language of the contract. However, the infant, Sally Ann, was not a party to the contract and cannot be bound by its provisions. Obviously, the majority does not think that Sally Ann, being eight and one-half months in her mother's womb, is a human being. All the reasons the majority cite against the parents as to why they don't have a cause of action, do not and should not apply to Sally Ann, a living, breathing special child. Thus, a cause of action should be allowed on Sally Ann's behalf.
It is noted that in the original opinion, the majority gave the benefit of the doubt to the moving parties, Kornhaus and Moorman, as stated in their standard of review for summary judgment. On petition for rehearing the author has amended the opinion by changing the name to Stoneciphers, of course, without showing any benefit to the Stoneciphers. However, viewing the evidence in its proper light, i.e., favoring the non-moving party, the Stoneciphers, there are genuine issues of material fact which should be resolved by a jury before the case can be summarily dismissed.
Although disputed, there is evidence that the sellers had superior knowledge that the healthy appearance of the tree limb belied its rotten core. In September, 1985, just before the Stoneciphers made their offer to purchase the house, Hurricane Elena swept across the Gulf Coast. Prior to the January, 1986, closing, Jessie Cuevas, a local tree trimmer who had inspected the tree both before and after the hurricane, told Kornhaus and Moorman that the tree needed immediate work, but they felt it would be too expensive and decided to leave it for the new owners. Further, John Davis, a horticultural expert with the Mississippi State University Extension Service, who had inspected the tree after the accident, recalled that prior to the sale, he had talked with either Moorman or Kornhaus about a hollow cavity where the limb joined the trunk in which a barn owl lived, which indicated that the limb could break and fall.
A rod or cable which had run from the limb to the trunk of the tree snapped during the hurricane. About a week after the hurricane, Mary Lee Stonecipher pointed this out to Kornhaus, who, she said, told her, "You don't have to worry about that, the cable is not there to keep the limb from falling, it's there to keep it from growing into the house." An investigator's report later revealed that this was just an assumption Kornhaus had made without making any effort to determine the real purpose of the cable. The Stoneciphers relied on that representation *966 and did not worry about the tree limb.
The majority, however, rejects as a matter of course the legal theories set forth by the Stoneciphers and relies instead on the general premise that a seller is not liable to a purchaser for any injuries resulting from a defect in the property once the deed has been signed and ownership has been transferred. Great Atlantic and Pacific Tea Co. v. Wilson, 408 N.E.2d 144 (Ind. App. 1980); Brock v. Rogers & Babler, Inc., 536 P.2d 778 (Alaska 1975). Not finding any support for its decision in Mississippi jurisprudence, the majority looks to other jurisdictions for guidance. In so doing, they overlook cases from this Court which have acknowledged that there exist exceptions to this general principle when the defect is latent and the seller has knowledge superior to that of the buyer. Just as the law of products liability has eviscerated the doctrine of caveat emptor as it applied to the purchase and use of items of personal property, so our case law has eroded the doctrine's applicability to latent defects in real property. See O'Cain v. Harvey Freeman and Sons, Inc., 603 So.2d 824, 831 (Miss. 1991) (Sullivan, J., Concurring). Restatement (Second) of Torts § 353 (1977) sets forth the standard of liability when a seller of real property fails to reveal to the purchaser dangerous conditions known to him as follows:
(1) A vendor of land who conceals or fails to disclose to his vendee any condition, whether natural or artificial which involves unreasonable risk to persons on the land, is subject to liability to the vendee and others upon the land with the consent of the vendee or his sub-vendee for physical harm caused by the condition after the vendee has taken possession, if
a) the vendee does not know or have reason to know of the condition or the risk involved, and
b) the vendor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to believe that the vendee will not discover the condition or realize the risk.
While we have not expressly adopted § 353, our decisions reflect an implied acceptance of its tenets. Using an analytical framework parallelling that of § 353, we have found contractors liable for the negligent construction of homes built on Yazoo clay when those contractors knew or should have known that unstable soil conditions existed, but did not reveal this information to the purchasers of the new homes. Parker v. Thornton, 596 So.2d 854 (Miss. 1992); Gilmore v. Garrett, 582 So.2d 387 (Miss. 1991). Both in Parker and in Gilmore, the contractors were not only the builders of the subject houses, but also the sellers. Moreover, the plaintiffs in Gilmore had purchased the house some years after it was constructed, not directly from the contractor/vendor who was ultimately found liable. In Parker, where foundation failure was caused by Yazoo clay and improper site preparation, expert testimony was presented that the contractor should have known that Yazoo clay was a real problem. Just as Mary Lee Stonecipher inquired about the condition of the tree, the purchasers of the house in Parker specifically expressed their concern about the Yazoo clay. We held in that case that this created a duty to warn the purchasers about any potential problems, yet the contractor merely told them that he had "beefed up the foundation." 596 So.2d at 858. In O'Cain, we opened still wider the door to liability by allowing tenants to bring suit against landlords for injuries caused by latent defects when the landlord knew of the problem but failed to inform the tenant. 603 So.2d at 830.
Despite this trend in our decisions, the majority states that even if it chose to adopt § 353, it cannot be "conclusively" shown that either Kornhaus or Moorman had superior knowledge of the condition of the tree limb. Our role in reviewing a motion for summary judgment is not to draw conclusions about the evidence but rather to determine whether there exists a triable issue of material fact. There is no appreciable difference between the cases involving Yazoo clay in Central Mississippi and oak trees on the Gulf Coast, particularly in the wake of a hurricane. The record contains evidence that the sellers knew that the limb had a rotten core, that an owl lived in a hollow in the limb near the trunk, and that a cable or rod providing some *967 support for the limb had broken during Hurricane Elena. Furthermore, they had been put on notice after the hurricane that the limb required immediate attention, yet decided that the work was too expensive and could be taken care of by the purchasers. Nevertheless, they assured the Stoneciphers that the limb was nothing to worry about. That the sellers had superior knowledge, as well as the facts alluded to above, present questions for a jury.
In rejecting the Stoneciphers' alternate theory of negligent misrepresentation, the majority then states unequivocally that Kornhaus had no knowledge superior to that of the Stoneciphers regarding the perilous condition of the tree limb. In Berkline Corp. v. Bank of Mississippi, 453 So.2d 699 (Miss. 1984), we set forth the elements of negligent misrepresentation. In order to recover, the plaintiff must show: (a) a misrepresentation or omission of a fact; (b) the representation or omission is material or significant; (c) a failure to exercise reasonable care; (d) reliance on the misrepresentation or omission; and (e) damages caused directly and proximately by reasonable reliance on the representation or omission. Id. at 702. Again, there is sufficient evidence to put the question to a jury. Kornhaus told Mary Lee Stonecipher not to worry about the tree limb and failed to mention either the presence of the hole where the barn owl lived or that Cuevas had recommended that the limb needed immediate attention. These representations clearly were material to the condition of the tree limb and the risk it posed. In so doing, Kornhaus and Moorman failed to exercise reasonable care. The Stoneciphers relied on the representations, and the injuries to Mary Lee and Sally Ann resulted.
Further, the majority finds that the Stoneciphers are precluded from suit by the "as is" clause of the real estate contract, to which Sally Ann was not a party. The clause provides that:
It is understood and agreed that the property is sold in "as is" condition without any warranty whatsoever as to the state of condition of the improvements on the property. (emphasis added)
As the majority points out, the "as is" provision was handwritten into the "Special Provisions" area of the contract and not mere boilerplate language. Black's Law Dictionary 692 (5th ed. 1979) defines "improvement" as follows:
A valuable addition made to property (usually real estate) or an amelioration in its condition, amounting to more than repairs or replacement, costing labor or capital, and intended to enhance its value, beauty or utility or to adapt it for new or further purposes. Generally, buildings, but also may include any permanent structure or other development, such as a street, sidewalks, sewers, utilities, etc.

There is substantial evidence that the intent of the "as is" provision was to protect the sellers only from any defects in the "improvements" as defined above, that is, the house and its outbuildings, which were in need of renovation. Both Moorman and Kornhaus stated that they were concerned about the condition of the house and problems that could arise during renovation, and added the "as is" provision upon the advice of the realtor. Relying on the accepted definition of "improvement" as well as on the intent of the parties, I read the provision, as the Stoneciphers contend, to cover only "improvements" to the property, the house and its outbuildings, not the trees or any other natural conditions of the landscape. Accordingly, I disagree with the majority's interpretation of the provision and believe that it raises still another question for a jury to determine. Moreover, even assuming arguendo that the parties intended to impart a broader meaning to the term "improvements" than generally accepted, Sally Ann, an infant and not a party to the contract, would not be precluded from suit by that interpretation.
There is sufficient evidence that the sellers had knowledge superior to that of the Stoneciphers regarding the true condition of the tree limb to place the negligence claims raised by Sally Ann and her parents before a jury. Moreover, although Sally Ann was not a party to the contract, interpretation of the "improvements" language of the "as is" contract is in dispute and likewise, her parent's *968 claim should be presented to a jury. We have often admonished trial judges to not assume the role of thirteenth juror. This Court, too, should avoid that role. Therefore, I dissent.
SULLIVAN, J., joins this opinion.
NOTES
[1] Under our decision in Glaskox v. Glaskox, 614 So.2d 906 (Miss. 1992), Sally Ann cannot bring suit against either of her parents.